UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

JOHNNY LEE WILSON                    CIVIL ACTION NO. 20-1005

                                     SECTION P

VS.

                                     JUDGE TERRY A. DOUGHTY

WARDEN BROWN, ET AL.                 MAG. JUDGE KAREN L. HAYES

### REPORT AND RECOMMENDATION

Plaintiff Johnny Lee Wilson, a prisoner at Morehouse Parish Jail proceeding pro se and in forma pauperis, filed this proceeding on approximately August 6, 2020, under 42 U.S.C. § 1983. He names the following defendants in their individual and official capacities: Warden Brown, Department of Corrections ("DOC"), Corporal Martin,[1] Sergeant Clacks, Corporal White, Warden Fife, and Ms. Kathy.[2]  For reasons below, the Court should dismiss Plaintiff's claims.

### Background

On December 31, 2019, another inmate, LaEddie Williams, sexually accosted Plaintiff, forcing Plaintiff to protect his "manhood."  [doc. # 1, p. 3].  Plaintiff claims that Warden Brown did not file charges under the Prison Rape Elimination Act ("PREA") after Plaintiff reported the accosting and asked him to file charges.  [doc. #s 1, p. 3; 8, p. 1].  Instead, Brown transferred Plaintiff[3] to the DOC, which, Plaintiff claims, promptly revoked his good-time credits without

---

[1] Plaintiff also refers to Martin as "Deputy Martin."  [doc. # 8, p. 3].

[2] This matter has been referred to the undersigned for review, report, and recommendation under 28 U.S.C. § 636 and the standing orders of the Court.

[3] Plaintiff does not specify whether Brown transferred *him* to a DOC facility or transferred the incident to the DOC for processing.  From context, the undersigned presumes the latter.

first interviewing him or investigating. [doc. # 1, p. 3]. Plaintiff faults Brown and the DOC for the loss of his good-time credits and for his resulting segregated confinement. [doc. # 8, p. 1].

Plaintiff claims that, in segregated confinement, he was confined twenty-four hours each day in a cell "roughly 30 feet square . . . ." *Id.* at 3. He was deprived of his property, "the ability to work," educational and vocational programs, television, congregation with other prisoners, outdoor recreation, and religious services. *Id.*

On March 22, 2020, LaEddie Williams was placed back in Plaintiff's dormitory. [doc. # 1, p. 4]. Plaintiff claims that after informing Corporal Martin and Warden Brown about Williams, Martin responded, "deal with it." [doc. #s 1, p. 4; 8, p. 1].

On May 17, 2020, another inmate, Warren Bridgett,[4] sexually accosted Plaintiff, forcing Plaintiff to protect his "manhood by hitting him in the lip." [doc. # 1, p. 4]. On May 18, 2020, Plaintiff informed Deputy Martin that he "was having a problem[,]" and Martin responded that "he would take care of it." *Id.* Martin did not take any action. [doc. # 8, p. 1]. Plaintiff suggests that later that morning while he slept, he was "hit in the head with a sock full of batteries," which "left a 3-inch gash in the top of [his] head." [doc. # 1, p. 4]. In his pleading, he does not specify who hit him, but in an attached grievance he suggests that it was Bridgett. [doc. # 8-1, p. 7]. Martin was in the dormitory "doing head count" at the time. [doc. # 1, p. 4]. Plaintiff faults Martin for failing to "handl[e] the problem" when Plaintiff notified him. [doc. # 8, p. 1].

Plaintiff claims that, on May 19, 2020, Martin drafted two false reports of the May 18, 2020 incident. [doc. #s 1, p. 4; 8, p. 1]. Plaintiff suggests that Martin falsely reported that Plaintiff hit Bridgett with a "sock and lock." [doc. #s 8, p. 1; 8-1, pp. 7-8]. He maintains that,

---

[4] Plaintiff also uses an alternative spelling, "Berdgett." [doc. # 8, p. 2].

because Martin drafted two false reports, he was placed in segregated confinement.  [doc. # 8, p. 1].

Plaintiff alleges that, on May 19, 2020, Deputy Rose asked him if he "was the one that was into it with Warren Berdgett . . . ."  [doc. # 8, p. 2].  Plaintiff said, "yes," and Rose replied that "it was the same reason he was moved into your dorm in the first place . . . [sic]."  *Id.* Plaintiff maintains that Rose essentially acknowledged that "this has happened more than just one occasional but with other inmates. [sic]."  *Id.*  Plaintiff claims that "they" knew Bridgett was a sexually aggressive inmate yet "they" did nothing and allowed "the above mentioned incident to occur."  *Id.*

Plaintiff claims that, on approximately May 20, 2020, Corporal White and Sergeant Clacks performed two false PREA investigations while Plaintiff was "in the hole . . . ."  [doc. # 8, p. 2].  He suggests that White and Clacks did not find in his favor, which caused him "harm by being referred to (DOC) to have [his] liberty taken and segregated confinement . . . [sic]."  *Id.*

On May 22, 2020, Plaintiff sought care for the injuries he suffered following the May 18 attack.  [doc. # 1, p. 5].  Before he could tell LPN Gillpatrick who attacked him, Gillpatrick stated, "let me guess, Warren Berdgett."  [doc. #s 1, p. 5; 8, p. 2].  Plaintiff maintains that Gillpatrick's guess confirms that "this has happened on more than 2 occasions" and that "this has been occurring with other inmates."  *Id.*

Plaintiff claims that Brown and the DOC never responded to his administrative remedy procedure requests.  [doc. # 8, p. 2].

Plaintiff claims that he asked Brown to document and photograph his injuries to use as evidence, but Brown did not.  [doc. #s 8, p. 2; 8-1, p. 4].

3

Plaintiff next refers the Court to a previous proceeding he filed here under 42 U.S.C. §1983, on approximately March 19, 2020, in which he claimed that his attorney, Donna Grodner, sabotaged a lawsuit she filed on his behalf concerning a wreck in a work-release van at Caddo Correctional Center and stolen work-release funds from his account when he was transferred to Morehouse Parish Detention Center ("MPDC"). *Johnny Lee Wilson v. Donna Grodner*, 3:20-cv-0402 (W.D. La. 2020). In that proceeding, on March 31, 2020, the Court instructed Plaintiff to either pay the $400.00 filing fee or file a completed application to proceed in forma pauperis. *Id.*

Here, Plaintiff alleges that, on April 2, 2020, he "serve[d] another account sheet for [his] lawsuit to Warden Fife." [doc. # 1, p. 3]. It seems Plaintiff is alleging that he asked Warden Fife to complete his application to proceed in forma pauperis for the previous lawsuit. *Id.* On April 4, 2020, Plaintiff asked Sergeant Clacks "about the account sheet to which he stated, 'ask Warden.'" *Id.* On April 6, 2020, he asked Warden Brown "about the account sheet to which he stated, 'I don't know.'" *Id.* On April 7, 2020, Plaintiff "asked Warden Brown about the account sheet . . . ." *Id.* Plaintiff suggests that Brown said he still did not know. *Id.* On April 8, 2020, "and other dates," Plaintiff asked Ms. Kathy for a stamped envelope, but Kathy refused, stating that "they" no longer supply envelopes or stamps. [doc. #s 1, p. 3; 8, p. 3]. Plaintiff was forced to sell his "trays" to obtain stamped envelopes. *Id.*

On April 9, 2020, in the previous lawsuit against Grodner, Plaintiff filed a letter, suggesting that the warden at MPDC refused to return his in forma pauperis application. *Wilson*, 20-cv-0402. In the same letter, he maintained that MPDC no longer supplied stamps or envelopes.

On April 13, 2020, Plaintiff asked Warden Fife about his "account sheets," and Fife responded that Plaintiff "would be getting them back." *Id.*

On May 20, 2020, this Court struck Plaintiff's previous suit against Grodner because Plaintiff failed to file his pleadings on an approved form and failed to file a completed in forma pauperis application on an approved form. *Wilson*, 20-cv-0402. Here, Plaintiff faults Brown and Fife for withholding "legal documents to cover up . . . stolen work release funds and to stifle other legal matters . . . ." [doc. # 8, p. 2].

Plaintiff "feels he has been retaliated against for the filing of said lawsuit as he has been sent to (MPDC's) . . . Disciplinary Camp and is being further threatened [by Morehouse Parish Jail personnel] to 'let other inmates stab him.'" *Id.* at 3.

Plaintiff seeks: (1) compensation from defendants in their individual and official capacities for his physical pain, suffering, psychological damages, humiliation, anguish, loss of liberty, other unspecified monetary loss, loss of privileges, lost quality of life, and lost liberty; (2) restoration of his good-time credits; and (3) removal from the "Morehouse Parish system as he fears for his life." [doc.#s 1, p. 6; 8, p. 3].

## Law and Analysis

### 1. Preliminary Screening

Plaintiff is a prisoner who has been permitted to proceed in forma pauperis. As a prisoner seeking redress from an officer or employee of a governmental entity, his complaint is subject to preliminary screening pursuant to 28 U.S.C. § 1915A.[5] See *Martin v. Scott,* 156 F.3d 578, 579-80 (5th Cir. 1998) (*per curiam*). Because he is proceeding in forma pauperis, his Complaint is also subject to screening under § 1915(e)(2). Both § 1915(e)(2)(B) and § 1915A(b)

---

[5] Under 28 U.S.C. § 1915(h), "'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."

provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim on which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Id.* at 327. Courts are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless. *Id.*

A complaint fails to state a claim on which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). Plausibility does not equate to possibility or probability; it lies somewhere in between. *Id.* Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *Twombly,* 550 U.S. at 556.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra.* A well-pled complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely. *Twombly, supra.*

In making this determination, the court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett,* 157 F.3d 1022, 1025 (5th Cir. 1998). However, the

6

same presumption does not extend to legal conclusions.  *Iqbal, supra*.  A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id*.  "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim."  *City of Clinton, Ark. v. Pilgrim's Pride Corp*, 632 F.3d 148, 152-53 (5th Cir. 2010).  Courts are "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint."  *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994).

A hearing need not be conducted for every pro se complaint.  *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991).  A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone.  *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986).

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."  *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted).  Consistent with the standard above, a "[S]ection 1983 complaint must state specific facts, not simply legal and constitutional conclusions."  *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

**2. Prison Rape Elimination Act**

Plaintiff claims that Warden Brown did not file charges under the PREA after Plaintiff reported to Brown that another inmate sexually accosted him on December 31, 2019.  [doc. #s 1, p. 3; 8, p. 1].  Plaintiff also claims that, on approximately May 20, 2020, Corporal White and Sergeant Clacks performed two false PREA investigations while he was "in the hole . . . ."  [doc. # 8, p. 2].

The PREA does not create a private cause of action or a federal right enforceable in a Section 1983 action. *Krieg v. Steele*, 599 F. App'x 231, 232 (5th Cir. 2015). Thus, the Court should dismiss these claims.

To the extent Plaintiff does not rely on the PREA and simply faults Brown for failing to report his version of the December 31, 2019 incident to the DOC, the Court should dismiss this claim too. A plaintiff does "not have a constitutional right to have his grievances resolved in his favor or to have his claims reviewed pursuant to a grievance process that is responsive to his perceived injustices . . . ." *Burgess v. Reddix*, 609 F. App'x 211 (5th Cir. 2015); see *Taylor v. Cockrell*, 2004 WL 287339 at *1 (5th Cir. 2004) (holding that "claims that the defendants violated . . . constitutional rights by failing to investigate . . . grievances fall short of establishing a federal constitutional claim."). In *Sandin v. Conner*, 515 U.S. 472, 474 (1995), the Supreme Court left prisoners without a federally-protected right to have grievances investigated and resolved.[6]

### 3. Good-Time Credits

Plaintiff suggestively claims that Warden Brown is partially responsible for the DOC stripping him of his good-time credits because Brown (1) failed to relay his version of the December 31, 2019, incident to the DOC and (2) failed to document and photograph Plaintiff's injuries. [doc. #s 8, p. 2; 8-1, p. 4]. He likewise faults White and Clacks because they performed false PREA investigations. [doc. # 8, p. 2].

---

[6] See also *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) ("[The plaintiff] does not have a federally protected liberty interest in having . . . grievances resolved to his satisfaction . . . . [A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless.").

With respect to Plaintiff's request to restore his good-time credits, he must seek this relief in a habeas corpus action after exhausting all available state-court remedies. When a prisoner seeks an order to restore his good-time credits, the remedy is "available only in a habeas proceeding." *Rome v. Morales*, 68 F.3d 471 (5th Cir. 1995); see *Wolff v. McDonnell*, 418 U.S. 539, 554 (1974) ("The complaint in this case sought restoration of good-time credits, and the Court of Appeals correctly held this relief foreclosed under *Preiser*."); *Orange v. Ellis*, 348 F. App'x 69, 72 (5th Cir. 2009).

Plaintiff also seeks monetary relief for the loss of his good-time credits. "Where a judgment in favor of the plaintiff—even in a prison disciplinary proceeding—necessarily implies the invalidity of his conviction or sentence, a prisoner's claim for damages is not cognizable." *Orange*, 348 F. App'x at 72 (citing *Edwards v. Balisok*, 520 U.S. 641, 643 (1997)).[7] "[A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005); *White v. Fox*, 294 F. App'x 955, 960 (5th Cir. 2008) ("To the extent that White seeks restoration of good-time credits, reversal of the disciplinary board's decision, and expungement of the disciplinary proceeding from his record, *Preiser* . . . and *Heck* . . . bar these

---

[7] Under *Heck v. Humphrey*, 512 U.S. 477 (1994), a successful civil rights action that would necessarily imply the invalidity of a plaintiff's conviction or sentence must be dismissed unless the plaintiff first shows that the conviction or sentence has been reversed, expunged, declared invalid, or called into question by a federal court's issuance of a writ of habeas corpus. Courts assess "whether a claim is temporally and conceptually distinct from the related conviction and sentence."

avenues of relief, because such relief either directly or indirectly challenges the validity of the disciplinary board's finding of guilt and of the sanction imposed.").

Plaintiff's allegations here are tethered to his loss of good-time credits. He asks the Court to rule that: (1) Wood failed to either relay his version of events or file PREA charges; (2) Wood failed to document his injuries; and (3) Wood's failures caused him to lose his good-time credits. Ruling in Plaintiff's favor would necessarily imply the invalidity of the conviction underlying the loss of his good-time credits. The same analysis applies to the claims against White and Clacks.

Because the disciplinary proceedings have not been overturned administratively or through habeas proceedings, Plaintiff is barred from asserting a Section 1983 claim. See *id.* The Court should dismiss these claims.

**4. Procedural Due Process**

Plaintiff attributes his time in administrative segregation to Brown's alleged failure to report the December 31, 2019 sexual accosting. In segregated confinement, he was confined twenty-four hours each day in a cell "roughly 30 feet square . . . ." [doc. # 8, p. 3]. He was deprived of his property, "the ability to work," educational and vocational programs, television, congregation with other prisoners, outdoor recreation, and religious services. *Id.* He does not specify how long he was in administrative segregation, but it was no longer than from December 31, 2019, to March 22, 2020, when he mentions that he was back in a dormitory.

Similarly, Plaintiff claims that, on May 19, 2020, Corporal Martin drafted two false reports of the May 18, 2020 incident involving Inmate Bridgett. [doc. #s 1, p. 4; 8, p. 1]. He suggests that Martin falsely reported that Plaintiff hit Bridgett with "sock and lock." [doc. #s 8,

p. 1; 8-1, pp. 7-8].  He maintains that because Martin drafted two false reports, he was placed in segregated confinement.  [doc. # 8, p. 1].

Plaintiff also faults White and Clacks for his administrative segregation, claiming that they too performed false PREA investigations.

With respect to his claims against Martin, White, and Clacks, Plaintiff neither details the conditions in this later stint in segregated confinement nor specifies how long he remained there.

Ultimately, Plaintiff's punishment in segregated confinement did not implicate a protected property or liberty interest; thus, he does not state a plausible claim.  See *Carter v. Brown*, 772 F. App'x 67, 68 (5th Cir. 2019) (finding, where the plaintiff argued "that he was falsely charged and convicted at a hearing that violated established procedures, [and] relied on false evidence," that the plaintiff did not allege "a due process violation" because his punishment did not "implicate a  protected liberty interest[.]"); *Lasater v. Herrera*, 729 F. App'x 362, (Mem)–363 (5th Cir. 2018) (finding, where the plaintiff alleged that prison officials drafted a false disciplinary report and violated his due process rights by destroying the physical evidence, that the plaintiff's rights were not violated because his punishment was not atypical).

"'Inmates have no protectable property or liberty interest in custodial classifications.'" *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (quoting *Whitley v. Hunt*, 158 F.3d 882, 889 (5th Cir. 1998)).  "'[A]bsent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life of a prisoner, will never be a ground for a constitutional claim' because it 'simply does not constitute a deprivation of a constitutionally cognizable liberty interest.'"  *Martin v. Scott*, 156 F.3d 578, 580 (5th Cir. 1998) (quoting *Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996)); *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995) ("[A]dministrative segregation, without more, does not constitute a deprivation of a

constitutionally cognizable liberty interest."). "In other words, segregated confinement is not grounds for a due process claim unless it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Hernandez v. Velasquez*, 522 F.3d 556, 562-63 (5th Cir. 2008) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).[8]

Here, the Court must determine whether Plaintiff's segregated confinement constituted an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life, such that a liberty interest in avoiding the deprivation arises." *Wilkerson*, 774 F.3d at 853 (internal quotation marks and quoted source omitted). "In deciding whether changes to an inmate's conditions of confinement implicate a cognizable liberty interest, both *Sandin* and [*Wilkinson*] considered the *nature* of the more-restrictive confinement and its *duration* in relation to prison norms and to the terms of the individual's sentence." *Id.* (emphasis added). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (cited with approval by *Wilkerson*, 774 F.3d at 854). "In essence, courts employ a sliding scale, taking into account how bad the conditions are and how long they last." *Bailey v. Fisher*, 647 F. App'x 472, 476 (5th Cir. 2016). "On such a sliding scale, truly onerous conditions for a brief period of time may not be atypical; less onerous conditions for an extended period of time may be." *Id.*

---

[8] "Extraordinary circumstances" and "without more" are simply "alternative statements of the *Sandin* test: administrative segregation 'without more' or 'absent extraordinary circumstances' is administrative segregation that is merely incident to ordinary prison life, and is not an 'atypical and significant hardship' under *Sandin*." *Wilkerson v. Goodwin*, 774 F.3d 845, 853 (5th Cir. 2014).

With all of that said, however, the "Fifth Circuit recently suggested that two and a half years of segregation is a threshold of sorts for atypicality, such that 18-19 months of segregation under even the most isolated of conditions may not implicate a liberty interest." *Id.* (citing *Wilkerson*, 774 F.3d at 855).

Here, Plaintiff first claims that he was in administrative segregation for, at most, approximately three months. Even "under the most isolated of conditions," this period of segregation was not excessive in degree. See *Bailey*, 647 Fed. App'x at 476.

With respect to his second period in segregation, he does not detail the conditions or the length of time he remained there. Thus, the claims are conclusory and implausible.

As Plaintiff presents no extraordinary circumstances and alleges no atypical or significant hardships, he does not state a plausible procedural-due-process claim.[9]

Accordingly, the Court should dismiss these claims.

**5. Conditions of Confinement**

As above, Plaintiff claims that, in segregated confinement, he was confined twenty-four hours each day in a cell "roughly 30 feet square . . . ." [doc. # 8, p. 3]. He was deprived of his

---

[9] See *Bailey*, 647 Fed. App'x at 476 (finding that, if the prisoner was confined less than approximately nineteen months in segregation, he would not state a claim even considering that he was in lockdown 23-24 hours each day, that he lacked visitation, that he lacked contact with other prisoners, that he could not attend religious gatherings or educational/vocational programs, that he lacked entertainment and "canteen," that he could rarely use the telephone, and that he could only shower three times per week); see also *Palmer v. Cain*, 350 F. App'x 956, 957 (5th Cir. 2009) (finding that due process was not required because the appellant's 97 days in administrative segregation were not sufficiently atypical or significant); *Lewis v. Dretke*, 54 F. App'x 795 (5th Cir. 2002) (finding no claim where the prisoner "received 30 days' cell and commissary restriction (including loss of recreation and library privileges, as well as the ability to attend religious services), 90 days' loss of telephone privileges, 15 days of solitary confinement, a reduction from trustee class 4 to line class 1, and an increase of his custody level from minimum to medium."); *Perry v. Allemand*, 687 F. App'x 352, 353 (5th Cir. 2017) (finding no claim where the prisoner was housed in a special tier for six months without visitation privileges).

property, "the ability to work," educational and vocational programs, television, congregation with other prisoners, outdoor recreation, and religious services. *Id.* He does not specify how long he was in administrative segregation, but it was no longer than from December 31, 2019, to March 22, 2020, when he mentions that he was back in a dormitory.

"While the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment does require that prisoners be afforded 'humane conditions of confinement' and prison officials are to ensure that inmates receive adequate food, shelter, clothing, and medical care." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). To establish an Eighth Amendment violation, a prisoner must demonstrate that a prison official was deliberately indifferent to conditions that resulted in the "extreme deprivation[,]" *Shannon v. Vannoy*, 682 F. App'x 283, 285 (5th Cir. 2017), of "the minimal civilized measure of life's necessities."[10] *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008). To establish deliberate indifference, the prisoner must show that the official knew of and disregarded an excessive risk to inmate health or safety; the official must have been both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must have drawn the inference. *Farmer*, 511 U.S. at 837.

"*Some* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or

---

[10] The deprivation alleged must be, objectively, sufficiently serious. *Farmer*, 511 U.S. at 834. This standard is not static: the inquiry is whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quotation marks and quoted source omitted).

exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotation marks and quoted source omitted).[11]  However, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

Here, Plaintiff first claims that he was deprived of his property, but he does not specify what he lacked or how lacking the unspecified property caused an extreme deprivation of a life necessity.

Plaintiff claims that he lacked educational and vocational programs.  Plaintiff, however, has no constitutional right to participate in these programs.[12]  Moreover, "the lack of a rehabilitative program does not by itself constitute cruel and unusual punishment . . . .").  *Alberti v. Klevenhagen*, 790 F.2d 1220, 1228 (5th Cir. 1986).  Plaintiff ultimately does not explain how lacking these programs deprived him of any life necessity.

Next, Plaintiff alleges that he lacked television, was not allowed to congregate with others, was unable to work, and could not attend religious services.  But, like above, he does not

---

[11] "Such things as food, sleep, clothing, shelter, medical attention, reasonable safety, sleep, and exercise have been recognized by courts as basic physical human needs subject to deprivation by conditions of confinement." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007) (citing cases).

[12] *McBride v. Powers*, 364 F. App'x 867, 870-71 (5th Cir. 2010) (holding that the plaintiff "failed to state a claim for violation of his equal protection or due process rights, as inmates have no constitutional right to participate in rehabilitative or educational programs while incarcerated."); *Beck v. Lynaugh*, 842 F.2d 759, 762 (5th Cir. 1988) ("[A] state has no constitutional obligation to provide basic educational or vocational training to prisoners."); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995) (holding that the loss of a prison job did not implicate the prisoner's liberty interest even though the prisoner lost the ability to automatically accrue good-time credits).

explain how he was deprived of any life necessity, and he does not allege that these deprivations exposed him to a substantial risk of serious harm.

Finally, Plaintiff alleges that he was not allowed outdoor recreation.  He does not specify whether, for example, he lacked recreation, sunlight, fresh air, mental health, or exercise.  While recreation and exercise are certainly identifiable life needs,[13] Plaintiff's claim is conclusory: he does not allege that he could not exercise or engage in recreation in his cell.  See *Ruiz*, 679 F.2d at 1152 ("Of particular importance in determining an inmate's need for regular exercise are the size of his cell, the amount of time the inmate spends locked in his cell each day, and the overall duration of his confinement.") (internal footnotes omitted).  In addition, his confinement continued only approximately three months.[14]  Further, even assuming he claimed that he lacked adequate sunlight or vitamin D, he does not plausibly describe a *substantial* risk of serious harm. Overall, he does not claim that his inability to enjoy time outside constituted an extreme deprivation of a minimal civilized measure of life's necessities.

---

[13] See *Ruiz v. Estelle*, 679 F.2d 1115, 1152 (5th Cir. 1982), amended in part, vacated in part, 688 F.2d 266 (5th Cir. 1982) (citing, favorably, other courts' opinions that "inmates need regular exercise to maintain reasonably good physical and psychological health.").

[14] See *Lewis v. Smith*, 277 F.3d 1373 (5th Cir. 2001) (finding a similar claim "meritless because it [was] premised on the erroneous assumption that [the plaintiff] had an absolute right to exercise or recreation."); *Carter v. Hubert*, 452 F. App'x 477, 478-79 (5th Cir. 2011) ("In regard to his unconstitutional conditions of confinement claims that his placement in a restrictive cell program for seven days at a time, for a total of 26 days, resulted in a lack of exercise, deprivation of meals, and flu-like symptoms due to a severely cold cell, Carter has not demonstrated that prison officials violated his Eighth Amendment rights."); *Jones v. Diamond*, 594 F.2d 997, 1013 (5th Cir. 1979), on reh'g, 636 F.2d 1364 (5th Cir. 1981) ("Our cases have never held that convicted prisoners have a constitutional right to outdoor exercise."); *Hernandez*, 522 F.3d at 560-61 (finding, where the plaintiff alleged a denial of outdoor and out-of-cell exercise for thirteen months, that even if there was a "fact issue as to whether [the plaintiff] suffered from muscle atrophy, stiffness, loss of range of motion, and depression, there [was] nonetheless no indication these conditions posed a substantial risk of serious harm.").

When combined, the deprivations Plaintiff lists could, under facts not pled, conceivably deprive one of some aspect of mental health, but Plaintiff's approximately three-month span of enduring these deprivations does not reflect an extreme deprivation of mental health or a substantial risk of serious harm.  See *Haralson v. Campuzano*, 356 F. App'x 692, 697 (5th Cir. 2009).

The Court should dismiss these claims.

**6. Deprivation of Property**

To reiterate, Plaintiff claims that, in administrative segregation, he was deprived of most of his personal property.  He does not elaborate.  For instance, he does not identify a responsible defendant, and he does not explain whether he was deprived of his property due to negligence, an intentional act, or a policy, procedure, or regulation.  He also fails to specify whether his property was returned to him. This ostensible procedural-due-process claim is conclusory; the Court should dismiss it.

**7. Deprivation of Religious Services**

As above, Plaintiff claims that he was deprived of religious services in administrative segregation.  This claim, like its predecessor, is conclusory.

"To fall within the purview of the Free Exercise Clause, a claimant must possess a sincere religious belief."[15]  *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019).  The Court must then evaluate whether the regulation or practice affecting the plaintiff's religious belief "is reasonably related to legitimate penological interests."  *O'Lone v. Estate of Shabazz*, 482 U.S.

---

[15] See *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972) (noting that "philosophical and personal . . . belief does not rise to the demands of the Religion Clauses"); *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1212 (5th Cir. 1991), on reh'g, 959 F.2d 1283 (5th Cir. 1992) (citation omitted) ("[T]he Free Exercise query is whether this particular plaintiff holds a sincere belief that the affirmation is religious.").

342, 348 (1987).  "An inmate retains his right to the free exercise of religion, subject to reasonable restrictions stemming from legitimate penological concerns."  *Id.*

Here, Plaintiff does not: explain the circumstances surrounding his claim, allege whether he possesses a sincere religious belief, or explain how, and to what extent, defendants' actions limited or affected *his* exercise of religion.  He fails to plead enough facts.  See *Coleman v. Lincoln Par. Det. Ctr.*, 858 F.3d 307, 309 (5th Cir. 2017) (finding that the plaintiff "failed to allege any details regarding the circumstances of the denial of Jumu'ah prayer services (*e.g.*, the regulation or policy) that would allow a court to evaluate his claim besides the bare allegation that he was not able to attend.").  The Court should dismiss this claim.

**8. Transfer**

Plaintiff asks the Court to remove him from the Morehouse Parish System because he fears for his life there.  [doc. # 8, p. 3].

A prisoner has no constitutional right to be housed in any particular facility or transferred from one facility to another, even if conditions and amenities in one may be preferable to another.  *Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983); *Fuselier v. Mancuso*, 354 F. App'x 49, 2009 WL 3780729, at *1 (5th Cir. Nov. 12, 2009).  "The Due Process Clause does not, by itself, endow a prisoner with a protected liberty interest in the location of his confinement." *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("[T]he State may confine [a prisoner] and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.").

Moreover, in Louisiana, "any individual subject to confinement in a state adult penal or correctional institution shall be committed to the Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department.  The secretary of

the department may transfer an inmate from one such facility to another, insofar as the transfer is consistent with the commitment and in accordance with treatment, training, and security needs established by the department." LA. REV. STAT. §15:824(A).

Here, as Plaintiff has no federal constitutional right to be transferred to, or confined in, a place of his choosing, and because Plaintiff's placement lies solely in the purview of the Department of Public Safety and Corrections, the Court should dismiss his request for a transfer.

**9. Limitation on Recovery Under 42 U.S.C. § 1997e(e)**

Plaintiff alleges that, on December 31, 2019, LaEddie Williams, sexually accosted him. [doc. # 1, p. 3]. On March 22, 2020, Williams was returned to Plaintiff's dormitory. [doc. # 1, p. 4]. Plaintiff first claims that, after informing Corporal Martin and Warden Brown about Williams' return to the dormitory, Martin stated, "deal with it." [doc. #s 1, p. 4; 8, p. 1]. Plaintiff does not allege that Williams attacked or accosted him again.

Plaintiff also alleges that he "feels he has been retaliated against for the filing of said lawsuit as he has been sent to (MPDC's) . . . Disciplinary Camp and is being further threatened [by Morehouse Parish Jail personnel] to 'let other inmates stab him.'"

Apart from seeking a transfer, Plaintiff seeks only monetary relief for these claims. Under 42 U.S.C. § 1997e(e), "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." "[I]t is the nature of the relief sought, and not the underlying substantive violation, that controls: Section 1997e(e) applies to all federal civil actions in which a prisoner alleges a constitutional violation, making compensatory damages for mental or emotional injuries non-recoverable, absent physical injury." *Geiger v. Jowers*, 404 F.3d 371,

375 (5th Cir. 2005). "The 'physical injury' required by § 1997e(e) 'must be more than de minimus [sic], but need not be significant.'" *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (quoting *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)).

Here, Plaintiff "brought" this action when he was incarcerated, [doc. #s 1, 1-2], and he seeks monetary compensation for only mental or emotional injuries he suffered in custody. He may not recover monetary relief for these injuries.

Plaintiff does not claim that Martin's terse response, the alleged retaliation, or the threats caused him a more-than-de-minimis physical injury or any other injury compensable by monetary relief. Accordingly, the Court should dismiss Plaintiff's request for compensatory relief. As Plaintiff does not seek any other cognizable relief for these claims, the Court should dismiss them.

**10. Failure to Protect**

To state a failure-to-protect claim, Plaintiff must allege that defendants' actions or inaction amounted to deliberate indifference. That is, he must allege that a defendant "knew of and disregarded a substantial risk of serious harm." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017).

On May 17, 2020, Warren Bridgett sexually accosted Plaintiff, forcing Plaintiff to protect his "manhood by hitting him in the lip." [doc. # 1, p. 4]. On May 18, 2020, Plaintiff informed Deputy Martin that he "was having a problem[,]" and Martin responded that "he would handle it or take care of it." *Id.* Martin, however, did not take any action. [doc. # 8, p. 1]. Plaintiff suggests that later that morning, while he slept, he was "hit in the head with a sock full of batteries," which "left a 3-inch gash in the top of [his] head." [doc. # 1, p. 4]. In his pleading, he does not specify who hit him, but in an attached grievance he suggests that it was Bridgett. [doc.

# 8-1, p. 7].  Martin was in the dormitory "doing head count" at the time.  [doc. # 1, p. 4].  Plaintiff faults Martin for failing to "handl[e] the problem" when Plaintiff notified him.  [doc. # 8, p. 1].

When Plaintiff informed Martin that he was "having a problem," he may have informed Martin of a risk, but he did not inform Martin of a *substantial* risk of serious harm.  While Plaintiff potentially informed Martin of some risk, Plaintiff did not detail the nature or extent of the problem.  For instance, he did not tell Martin that he feared an attack or action from which he required protection, he did not explain why an attack was imminent, and he did not identify a potential assailant. See *Vela v. Garcia*, 728 F. App'x 285, 287 (5th Cir. 2018) ("Although Vela claims the HCJ personnel put him in danger by ignoring the prisoner's threats and releasing him into the dorm, he does not allege they acted with the requisite deliberate indifference. . . . In other words, Vela does not maintain they were aware of facts that lead to the inevitable conclusion he was exposed to substantial danger."  Plaintiff also does not allege that Martin knew Bridgett previously sexually accosted him.  To the extent Plaintiff told Martin more, Plaintiff does not detail it here.

Plaintiff alleges that, on May 19, 2020, Deputy Rose asked him if he "was the one that was into it with Warren Berdgett . . . ."  [doc. # 8, p. 2].  Plaintiff said, "yes," and Rose replied that "it was the same reason he was moved into your dorm in the first place . . . [sic]."  *Id.*  To the extent Plaintiff is claiming that someone intentionally assigned Bridgett to Plaintiff's dormitory to harm him, Plaintiff does not identify a responsible defendant.

Plaintiff suggests that "they" knew that Bridgett was a dangerous inmate yet "they" failed to protect Plaintiff from him.  He maintains that Deputy Rose essentially acknowledged that "this has happened more than just one occasional but with other inmates. [sic]."  *Id.*  He claims that

"they" knew that Bridgett was a sexually aggressive inmate yet "they" did nothing and allowed "the above mentioned incident to occur." *Id.* As above, however, Plaintiff does not identify a responsible defendant. To the extent he faults all defendants, he does not specify how any named defendant was deliberately indifferent. He also fails to clarify which "above-mentioned incident"—either Bridgett sexually accosting him or battering him—to which he refers.

Plaintiff again suggests that someone knew Bridgett was a dangerous inmate. On May 22, 2020, he sought care for the injuries he suffered following the May 18 attack. [doc. # 1, p. 5]. Before he could tell LPN Gillpatrick who attacked him, Gillpatrick stated, "let me guess, Warren Berdgett." [doc. #s 1, p. 5; 8, p. 2]. Plaintiff maintains that Gillpatrick's guess confirms that "this has happened on more than 2 occasions" and that "this has been occurring with other inmates." *Id.*

Plaintiff does not, however, claim that Gillpatrick failed to protect him from Bridgett, and he does not allege that any other defendant knew that "this has happened on more than 2 occasions." Even assuming defendants knew that Bridgett was a dangerous inmate, Plaintiff does plausibly allege that they knew Bridgett was a substantial threat to *him*. In *Williams v. Banks*, 956 F.3d 808, 812 (5th Cir. 2020), the court reasoned that an inmate's prior history of violence with another inmate did not mean that defendants knew the dangerous inmate posed a substantial risk of serious harm to the plaintiff.[16] See *Williams v. Martin*, 570 F. App'x 361, 365

---

[16] For support, the court cited the following: "*Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) ('An inmate's history of violence alone is insufficient to impute to prison officials' subjective knowledge of the inmate's danger to harm other inmates.' (citing *Norman v. Schuetzle*, 585 F.3d 1097, 1104-06 (8th Cir. 2009), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)); *see also Sanders v. Goodween*, No. 12-440-SDD-RLB, 2013 WL 5818610, at *6 (M.D. La. Oct. 29, 2013) ('[T]he mere fact that the offending co-inmate may have been involved in one or more prior inmate-on-inmate confrontations does not compel a finding that the determination to house the two inmates in a two-person cell at DWCC amounted to deliberate indifference.')."

(5th Cir. 2014) ("Williams alleged only that defendants failed to curb abuse of prisoners and that they knew that Martin had a propensity to assault prisoners based on his disciplinary records; his bald and conclusory allegations are insufficient to state a claim."); *Silva v. Moses*, 542 F. App'x 308, 311 (5th Cir. 2013) ("The vague contention by Silva that, although the defendants knew of previous violent incidents, they declined to take unspecified protective measures to prevent future attacks such as the one on him, does not show that any risk to Silva was clear to the officers.").

The Court should dismiss these claims.[17]

**11. Failure to Respond to Grievances**

Plaintiff claims that Brown and the DOC never responded to his administrative remedy procedure requests. [doc. # 8, p. 2]. As above, however, an inmate does "not have a constitutional right to have his grievances resolved in his favor or to have his claims reviewed pursuant to a grievance process that is responsive to his perceived injustices . . . ." *Burgess v. Reddix*, 609 F. App'x 211 (5th Cir. 2015). The Court should dismiss this claim.

**12. Access to Court**

Plaintiff refers the Court to a previous proceeding he filed here under 42 U.S.C. §1983, on approximately March 19, 2020, in which he claimed that his attorney, Donna Grodner, sabotaged a civil lawsuit she filed on his behalf concerning a wreck in a work-release van at Caddo Correctional Center and stolen work-release funds from his account when he was transferred to Morehouse Parish Detention Center ("MPDC"). *Johnny Lee Wilson v. Donna*

---

[17] The undersigned is sympathetic to Plaintiff's plight and, as the court stated in *Brown v. Harris Cty., Texas*, 409 F. App'x 728, 731 (5th Cir. 2010), the undersigned does not "suggest that jail officials have no duty to protect the inmates in their custody from assault by other inmates." "But maintaining safe and orderly prison is a difficult task, and even the most vigilant oversight may not be able to prevent every incident." *Id.*

*Grodner*, 3:20-cv-0402 (W.D. La. 2020).  In that proceeding, on March 31, 2020, the Court instructed Plaintiff to either pay the $400.00 filing fee or file a completed application to proceed in forma pauperis.  *Id.*

On April 2, 2020, Plaintiff "serve[d] another account sheet for [his previous] lawsuit to Warden Fife."  [doc. # 1, p. 3].  It seems Plaintiff is alleging that he asked Warden Fife to complete his application to proceed in forma pauperis for the previous lawsuit.  *Id.*

On April 4, 2020, Plaintiff asked Sergeant Clacks "about the account sheet to which [Clacks] stated, 'ask Warden.'"  *Id.*

On April 6, 2020, he asked Warden Brown "about the account sheet to which [Brown] stated, 'I don't know.'"  *Id.*  On April 7, 2020, Plaintiff "asked Warden Brown about the account sheet . . . ."  *Id.*  Plaintiff suggests that Brown said he still did not know.  *Id.*

On April 8, 2020, "and other dates," Plaintiff asked Ms. Kathy for a stamped envelope, but Kathy refused, stating that "they" no longer supply envelopes or stamps.  [doc. #s 1, p. 3; 8, p. 3].  Plaintiff was forced to sell his "trays" to obtain stamped envelopes.  *Id.*

On April 9, 2020, in the previous lawsuit against Grodner, Plaintiff filed a letter, suggesting that the warden at MPDC refused to return his in forma pauperis application.  *Wilson*, 20-cv-0402.  In the same letter, he maintained that MPDC no longer supplied stamps or envelopes.

On April 13, 2020, Plaintiff asked Warden Fife about his "account sheets," and Fife responded that Plaintiff "would be getting them back."  *Id.*

On May 20, 2020, this Court struck Plaintiff's previous suit against Grodner because Plaintiff failed to file his pleadings on an approved form and failed to file a completed in forma pauperis application on an approved form.  *Wilson*, 20-cv-0402.  Plaintiff faults Brown and Fife

for withholding "legal documents to cover up . . . stolen work release funds and to stifle other legal matters . . . ." [doc. # 8, p. 2].

To succeed on a claimed denial of access to courts, a plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial. *Lewis v. Casey*, 518 U.S. 343, 356 (1996); *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996) (holding that to state a claim of denial of access to the courts, a plaintiff must demonstrate that his position as a litigant was prejudiced as a direct result of the denial of access). "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it."[18] *Christopher*, 536 U.S. at 417-18.

The "injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 353. Rather, a plaintiff must demonstrate that the lack of access prevented him from filing or caused him to lose a pending case that attacks either his conviction or seeks "to vindicate 'basic constitutional rights'" in a civil rights action. *Id.* at 353-54 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)).

"Denial-of-access claims take one of two forms: forward-looking claims alleging 'that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time,' and backward-looking claims alleging that an official action has 'caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief.'" *Waller v. Hanlon*, 922 F.3d 590, 601 (5th

---

[18] "The underlying claim must be described well enough to apply the frivolity test and to show that its 'arguable' nature . . . is more than hope." *Sanchez v. Stephens*, 689 F. App'x 797, 799 (5th Cir. 2017) (citing *Christopher v. Harbury*, 536 U.S. 403, 416 (2002)).

Cir. 2019) (quoting *Christopher*, 536 U.S. at 413-14).

"To maintain a backward-looking claim, a plaintiff must identify (1) a nonfrivolous

underlying claim; (2) an official act that frustrated the litigation of that claim; and (3) a remedy

that is not otherwise available in another suit that may yet be brought." *United States v. McRae*,

702 F.3d 806, 830-31 (5th Cir. 2012); see *Christopher*, 536 U.S. at 413-14 (("These cases do not

look forward to a class of future litigation, but backward to a time when specific litigation ended

poorly, or could not have commenced, or could have produced a remedy subsequently

unobtainable.").

Here, Plaintiff's previous claims against Attorney Grodner concerning a wreck in a work-

release van and stolen work-release funds do not reflect claims that attack either his conviction

or seek "to vindicate 'basic constitutional rights'" in a civil rights action. Even assuming they

concerned basic constitutional rights, Plaintiff does not sufficiently identify a non-frivolous,

arguable claim because Attorney Grodner was not a state actor. To state a claim under Section

1983, a plaintiff must allege that a defendant acted "under color" of state law. 42 U.S.C. § 1983.

The Court should dismiss these claims.

### Recommendation

For the foregoing reasons, **IT IS RECOMMENDED** that Plaintiff Johnny Lee Wilson's

claims concerning the restoration of his good-time credits be **DISMISSED WITHOUT**

**PREJUDICE** to his right seek relief in a habeas corpus action after he exhausts all available

state-court remedies.

**IT IS FURTHER RECOMMENDED** that Plaintiff's claims for monetary relief for the

loss of his good-time credits be **DISMISSED** as frivolous until the *Heck* conditions are met.

**IT IS FURTHER RECOMMENDED** that Plaintiff's remaining claims be

**DISMISSED** as frivolous and for failing to state claims on which relief may be granted.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, this 9th day of September, 2020.

Karen L. Hayes
United States Magistrate Judge